IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 7, 2022 Session

**JOSHUA SIMPSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**Nos. 17-03802, 17-03803, 17-03804,      Paula Skahan, Judge**
**18-02800, I1900043**

_____

**No. W2021-00849-CCA-R3-PC**
_____

The Petitioner, Joshua Simpson, was convicted upon his guilty pleas to aggravated rape, aggravated robbery, two counts of aggravated kidnapping, and two counts of aggravated burglary, for which he received an effective twenty-year sentence. He filed a petition for post-conviction relief, which the trial court denied after a hearing. On appeal, he contends that the post-conviction court erred in denying relief on his claims that he received the ineffective assistance of trial counsel and that he did not knowingly, voluntarily, and intelligently enter his guilty pleas. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Lance R. Chism, Memphis, Tennessee, for the Appellant, Joshua Simpson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Petitioner's convictions relate to four home burglaries and associated crimes committed against the homes' residents. The plea agreement included the dismissal of additional charges related to the four incidents and a fifth theft incident, and the effective twenty-year sentence was part of the plea agreement. After the judgments were entered, the Petitioner filed the present post-conviction action. Counsel was appointed, the petition was amended, and the matter proceeded to a hearing.

At the post-conviction hearing, Memphis Police Department (MPD) Officer Timothy Mitchell testified that on August 9, 2017, he and another officer followed the Petitioner, who was in a car which "was possibly stolen." Officer Mitchell said that the other officer tried to conduct a traffic stop but that the driver, later identified as the Petitioner, fled, lost control, hit a guardrail, and was pinned in the car. Officer Mitchell stated that as he approached the car, he heard the Petitioner tell the female passenger to run because the car was stolen. Officer Mitchell said that the female passenger fled on foot and that he "grabbed . . . and dragged" Petitioner from the car. Officer Mitchell said that he asked the Petitioner why the Petitioner fled and that the Petitioner said something about having found the car. Officer Mitchell said the Petitioner later stated to the other officer that the Petitioner fled because he knew the car had been stolen. Officer Mitchell said he and the other officer did not advise the Petitioner of his *Miranda* rights because they "weren't asking him about crimes." Officer Mitchell said he was unaware at the time of other offenses for which the Petitioner was wanted. Officer Mitchell did not suspect that the Petitioner was intoxicated and did not smell alcohol or marijuana but said the other officer found alcohol in a search incident to arrest.

Trial counsel testified that he was appointed to represent the Petitioner in the fall of 2017. Regarding case number 17-03802, which involved a home invasion, rape, and robbery, counsel stated that the Petitioner gave an inculpatory statement to the police. Counsel said the victim had stated that she had not seen the perpetrator but that the victim said the perpetrator was black. Counsel said that no conclusions could be drawn regarding the identity of the perpetrator when the DNA evidence was submitted to the Tennessee Bureau of Investigation (TBI) laboratory. Counsel said the Petitioner's house was searched in this case and that items related to other crimes were discovered during the search.

Regarding case number 17-03803, which involved a home invasion, restraint of a victim with duct tape, robbery, and car theft, trial counsel testified that the victim had been unable to identify the perpetrator. Counsel said that no DNA or fingerprint evidence linked the Petitioner to this incident but that the Petitioner had given an inculpatory statement and that the victim's cell phone had been found during a search of the Petitioner's home.

Regarding case number 17-03804, which involved a home burglary and car theft, trial counsel testified that fingerprint evidence was recovered from a cell phone box and the car, but the prints were never identified as being those of the Petitioner. Counsel said that a television taken from the victims' home was found during the search of the Petitioner's home and that the Petitioner gave an inculpatory statement about the offense.

Regarding case number 17-03805, which involved a theft from a home doorstep of a box containing jewelry, trial counsel testified that the items were found during a search

of the Petitioner's home. Counsel said the Petitioner gave an inculpatory statement about the offense.[1]

Regarding case number I1099943, which involved a home invasion by two men who dragged the victim from bed, demanded money and the victim's debit card and PIN, forced the victim into the trunk of her car, and drove around before stopping in the victim's neighborhood, where she was able to escape, trial counsel testified that he did not receive discovery on the case because the Petitioner was charged by information. Counsel said he had learned since the Petitioner filed the post-conviction petition that the victim had only been able to identify the perpetrators as two black males.

Regarding case number 18-02800, which involved a home invasion, trial counsel testified that the victim was grabbed by a black man, who demanded money and took her debit card. Counsel said the victim later learned her car was missing. Counsel said that the Petitioner gave an inculpatory statement about the incident and that the victim's debit card was in the Petitioner's pocket when he was arrested the next day in a stolen car.

Trial counsel testified that he met with the Petitioner at the jail ten to twelve times during the course of the representation and that he met with the Petitioner on court dates. Counsel said he reviewed the discovery with the Petitioner for the cases which were charged by indictment and that he gave the Petitioner copies of the discovery materials. Counsel said he did not "collect" or review the police body camera footage. He thought he had requested the footage, however. He said that, at the time, he had been making discovery requests by email, but that he had encountered difficulties with the method in this case. Counsel did not review bank surveillance footage of a suspect withdrawing money from an ATM with a debit card belonging to one of the victims. Counsel thought he had requested the footage but did not have an archived email to corroborate this. Counsel said he received the State's DNA and forensic analysis results. He was unsure when he received them but estimated it had been about two months before the Petitioner entered his guilty pleas. Counsel thought he had provided the analysis results to the Petitioner, but he said that he understood the Petitioner had not received it. Counsel said that he was certain he and the Petitioner discussed the results and that he told the Petitioner "essentially that there's inconclusive DNA on all of the evidence that's collected." Counsel was certain that he did not tell the Petitioner that the Petitioner's DNA tied him to "the crime." Counsel thought the prosecutor misspoke at the guilty plea hearing when he stated that a bath towel collected in the aggravated rape case tied the Petitioner to the offense. Counsel said the case had remained pending for as long as it had because the parties awaited the forensic analysis results.

---

[1] The charge for this offense was dismissed as part of the plea agreement.

The forensic biology analysis report for case number 17-03802, the case involving a rape, was received as an exhibit to trial counsel's testimony. It reflects that semen was not detected in samples collected from the victim's saliva, vagina, vulva, and anus; "possible hairs" from the victim's bedsheet; and towel from the scene. DNA testing of the inside and outside of a glove from outside the victim's home was inconclusive "[d]ue to the limited profile obtained and the unknown number of potential contributors to the profile." Penile swabs from the Petitioner contained the DNA of two individuals. If the Petitioner were assumed to be one of the contributors to the mixture, the second profile was consistent with an unknown female, and the victim was excluded as the second contributor.

Trial counsel testified that the Petitioner's confessions were the most damaging evidence to the defense. Counsel said all of the confessions were given on August 9, 2017, to two detectives, "around the same time [and] in the same circumstances." Counsel said he asked the Petitioner if he had been advised of his *Miranda* rights and at what point the advice of rights occurred. Counsel said the Petitioner told him that the detectives had advised him of his rights before the Petitioner gave his statements. Counsel said that he asked the Petitioner why he felt compelled to talk to the detectives and that the Petitioner stated the detectives had said "that they had evidence and they . . . would help [the Petitioner]." Counsel later said he had not obtained a "specific timeline" of whether the Petitioner thought the detectives "had evidence before or after they read him his rights and . . . they said they would help him." Counsel said that to the best of his recollection, the Petitioner said the detectives read him his rights "before they really had any kind of conversation with him." Counsel agreed that the Petitioner never stated he had given an inculpatory statement before being advised of his rights. Counsel said that when he received the discovery materials, he noted that the advice of rights form "appeared to have been administered pretty early on the day [the Petitioner] was arrested." Counsel thought the Petitioner might have "talked about interacting with the officers" at the time of the arrest but did not recall if the Petitioner had said he told the officers he had fled from them because he was in a stolen car. Counsel said the Petitioner had not identified any threats by the police which might have prompted him to inculpate himself. Counsel said the assurance that the detectives would help the Petitioner was the only evidence which might support a claim of coercion.

Trial counsel testified that the Petitioner claimed to have been "on drugs of some kind" when he was arrested and questioned on August 9, 2017. Counsel recalled that the Petitioner had stated on the advice of rights form that he was not "under the influence." Counsel thought the Petitioner had stated he did not remember signing the form.

Trial counsel testified that, in his opinion, the Petitioner did not have a strong argument to support suppression of his inculpatory statements. Counsel said the prosecutor assigned to the Petitioner's cases had a reputation as a "fierce" trial attorney and that he

had not expected to receive a plea offer in which the Petitioner might be interested. Counsel said the case was later transferred to another prosecutor, who made the plea offer that the Petitioner ultimately accepted. Counsel said that when the successor prosecutor had been assigned, counsel changed his posture to be less litigious because the successor prosecutor indicated his willingness to settle the case with a reasonable offer. Counsel said he advised the Petitioner that he thought he could negotiate with the successor prosecutor for a reasonable offer "that would be as low as it could ever possibly be no matter what kinds of things [counsel] tried to litigate." Counsel said he advised the Petitioner that if the Petitioner did not want the offer, counsel would pursue suppression motions "and litigate every aspect of all these cases," which included motions to suppress. Counsel said that in dealing with the successor prosecutor, he did not see a reason to "add friction to" the plea offer negotiation process by filing suppression motions. Counsel acknowledged that he had not been told that an offer would be withdrawn if he filed a suppression motion, but he said he thought filing a motion might stall the settlement negotiations. He also acknowledged that the State's cases would not have been as strong if the defense had prevailed in suppressing evidence. In counsel's review of the discovery materials, he had not seen anything that provided a "powerful argument" for suppression of the statements or the identification from the photograph lineup. He noted, as well, that the State had other evidence of the Petitioner's guilt. Counsel agreed that stolen property was recovered in some of the cases and that the Petitioner possessed a stolen debit card belonging to one of the victims when the Petitioner was arrested. Counsel agreed that the Petitioner had mentioned a white cloth or towel he had used during the rape and that a white towel had been recovered as evidence.

Trial counsel said he had only given "general" consideration to filing a motion to suppress evidence of one victim's identification of the Petitioner in a photograph lineup. Counsel reiterated that his approach had been to try to work with the successor prosecutor to obtain a favorable settlement for the Petitioner. When asked to view the photograph lineup for anything that might be unduly suggestive, counsel noted that the Petitioner's hair was fuller than that of the other subjects, that the Petitioner's forehead was not as high as that of the others, and that the Petitioner's facial hair was more pronounced than that of the others. Counsel noted, as well, that the Petitioner's striped shirt stood out. The photograph lineup was received as an exhibit.

Trial counsel testified that his investigator interviewed all but one of the victims, whose case was charged by information. With regard to the victim who was not interviewed, counsel said that the preliminary hearing had not yet taken place and that he had not yet received discovery materials for this case. Counsel noted, as well, that he had received information that this victim was still angry about the incident and wanted the Petitioner to be punished. Counsel said that, in view of the efforts to settle the case, he did not "see the benefit . . . of kicking the hornet's nest" by sending an investigator to talk to this victim.

Trial counsel testified that he believed the Petitioner's goal was to reach a plea agreement involving as short a sentence as possible. Counsel said that the plea offer the Petitioner accepted was the best one the defense had received and that counsel had been "pleasantly surprised" to have received the offer. Counsel said he counseled the Petitioner about the serious nature of the charges, the likely emotional response the facts would provoke from a jury, and the likelihood that damaging evidence would not be excluded from the jury's consideration. Counsel said he told the Petitioner that the Petitioner was "in a really, really bad position" relative to the likelihood of conviction. Counsel said that he reviewed the possible sentencing consequences for each of the offenses and that he advised the Petitioner of his belief that the twenty-year offer was the best that they would receive. Counsel said that the Petitioner wanted a ten-year offer but that counsel advised the Petitioner he did not think this was a possibility in view of the allegations. Counsel said he and the Petitioner had a "series of conversations" about the plea offer and the risks of going to trial. Counsel said that, at the time, accepting the plea offer "seemed to be the decision that [the Petitioner] wanted to make."

Trial counsel testified that his process in a case involving charges related to multiple incidents was to get as much information as possible about the offenses, explain to the defendant what the evidence was and what the State would have to prove, and advise the defendant on the range of punishment for the offenses. Counsel agreed that he advised the Petitioner that he might face seventy-eight to 120 years if he were convicted at a trial and said he thought the Petitioner's maximum possible exposure was 149 years, eleven months, and twenty-nine days. Counsel said he advised the Petitioner that he did not think the trial court would impose a minimum sentence if the Petitioner were convicted of all of the offenses and that he anticipated the court would impose some consecutive sentences. Counsel said that the State's initial offer was for twenty years at 100% and that he was able to negotiate the offer to fifteen years at 100% followed by five years at 30%.

The transcript of the April 23, 2019 guilty plea hearing, which was received as an exhibit at the post-conviction hearing, reflects that the Petitioner, a high school graduate, voiced his understanding of the plea agreement, including the charges to which he was pleading guilty; his right to a jury trial, at which his attorney would be able to cross-examine the State's witnesses; his right to decide whether to testify at a trial; the State's burden to prove the charges at a trial; and the possible punishments for the charges. The Petitioner acknowledged a prior unlawful weapon possession conviction and a probation violation, which he agreed were misdemeanors. The Petitioner stated that he understood he would be required to register as a violent sex offender and that he would be subject to community supervision for life. He said that he did not have any questions about the sentences, that he had not been forced or pressured to plead guilty, and that he was satisfied with his trial counsel. The trial court found that the Petitioner was "freely, knowingly, voluntarily, and intelligently" pleading guilty.

MPD Sergeant Demarius Jones testified that on August 9, 2017, he was working as a detective and that around 6:00 a.m., he and Detective Brown interviewed the Petitioner, who had been stopped in a stolen car. Sergeant Jones said he and Detective Brown advised the Petitioner of his *Miranda* rights and then interviewed him. The Advice of Rights form was received as an exhibit. Sergeant Jones said the form reflected that he advised the Petitioner of his rights at 6:03 a.m., which Sergeant Jones said the Petitioner signed. Sergeant Jones said he did not notice any unusual behavior, such as slurred speech or sleepiness, from the Petitioner. Sergeant Jones did not smell the odor of an intoxicant on the Petitioner and did not think the Petitioner was under the influence of drugs or alcohol. Sergeant Jones identified a detention log, which was received as an exhibit, and which reflected that the Petitioner was checked on every thirty minutes from 5:30 a.m. until 6:50 p.m. Sergeant Jones agreed that the Petitioner had been asleep at 9:00 a.m. when Sergeant Jones entered the interview room. Sergeant Jones said he and Detective Brown did not question the Petitioner about any crimes or background information before advising the Petitioner of his rights.

Sergeant Jones testified that the Petitioner initially denied having stolen the car in which he had been apprehended and that the Petitioner claimed to have found the car. Sergeant Jones said the Petitioner eventually admitted he had broken into a house and had stolen the car keys in order to take the car. Sergeant Jones said that the Petitioner confessed to a second criminal incident and that the Petitioner was given a meal around 8:30 a.m. Sergeant Jones said that the interview resumed around 9:00 a.m. and that he and Detective Brown obtained additional statements from the Petitioner until the Petitioner was given lunch at 1:45 p.m. Sergeant Jones said that in addition to the meal break, the Petitioner was given a break to smoke and restroom breaks. Sergeant Jones said the Petitioner gave seven statements in total. Sergeant Jones said he never raised his voice with the Petitioner.

When asked why the Petitioner's first statement about the incident involving a rape mentioned the home invasion and theft but not the rape, Sergeant Jones testified he did not question the Petitioner at this point about the rape aspect of the incident because the Sex Crimes Division was going to handle that part of the investigation. Sergeant Jones said that later in the interview, he questioned the Petitioner about the rape after a lieutenant in the Sex Crimes Division asked him to do so. Sergeant Jones said the Petitioner initially denied the rape but later said he had not completely penetrated the victim and that he had inserted "just the head of his penis" and that he "had been feeling funny" since the incident. Sergeant Jones did not recall if he had told the Petitioner that they had DNA evidence which would identify the perpetrator but said he would not have told the Petitioner that the police had DNA evidence which implicated the Petitioner. Sergeant Jones denied having told the Petitioner, "[T]he truth will set you free." Sergeant Jones agreed that the Petitioner signed a typewritten confession to the rape at 4:40 p.m., after which the Petitioner was booked.

Sergeant Jones testified that on August 11, 2017, he showed a photograph lineup to one of the victims. He said she identified a suspect.

MPD Detective Robert Brown testified that he and Sergeant Jones interviewed the Petitioner on August 9, 2017. Detective Brown said they entered the interview room where the Petitioner was waiting around 6:00 a.m. and introduced themselves. Detective Brown said they advised the Petitioner of his *Miranda* rights before questioning him about the crimes they were investigating. Detective Brown said they had the Petitioner read the advice of rights form aloud and sign and initial it. Detective Brown said that the Petitioner appeared to understand his rights and that he did not observe any signs of intoxication. Detective Brown said the Petitioner stated he was not under the influence of alcohol or drugs.

Detective Brown testified that he assembled the photograph lineup that was shown to one of the victims. Detective Brown said he obtained the photographs from a database containing driver's license photographs. He agreed that the individuals in the photographs he selected had similar haircuts and little to no facial hair and that he did not think the lineup was unduly suggestive. He said the victim who made an identification from a lineup described the perpetrator as a black male in a hoodie.

Detective Brown testified that the Petitioner initially denied any involvement in burglaries in a neighborhood but that the Petitioner eventually admitted he had broken into homes and had taken property. Detective Brown recalled that the Petitioner claimed to have driven a car he found. Detective Brown said he and Sergeant Jones told the Petitioner that they did not believe his account of having found a car. Detective Brown agreed that he might have told the Petitioner that security footage from an ATM would show the Petitioner's face.

Detective Brown denied that he ever told the Petitioner he would help the Petitioner if the Petitioner confessed. Detective Brown denied telling the Petitioner that he should confess in order to avoid having someone else raise the Petitioner's children. Detective Brown said that the Petitioner's denials were brief before admitting his involvement in the offenses. Detective Brown's testimony about the timing of the questioning, breaks, and number of statements was consistent with Sergeant Jones' testimony. Detective Brown also testified consistently with Sergeant Jones regarding their initially not asking the Petitioner about the rape but questioning him about it later in the day at the request of the Sex Crimes Division. Detective Brown did not recall having said that DNA evidence would implicate the Petitioner in the rape, but he acknowledged, "[I]t may have been said." Detective Brown agreed that the police did not have any DNA analysis results at the time. He did not recall having told the Petitioner that the truth would set the Petitioner free. Detective Brown acknowledged that he had no recollection if the Petitioner was allowed

-8-

to make a telephone call and that he had no documentation showing that the Petitioner made a call.

The Petitioner testified that he and trial counsel met about ten to eleven times during the course of counsel's representation. The Petitioner said that counsel provided him with the discovery materials and that they reviewed "certain things." The Petitioner said counsel did not show him any ATM security footage. The Petitioner said that counsel initially stated the DNA analysis report had not been completed but that counsel told him in late 2018 or early 2019 that the Petitioner's DNA had been identified on "one of the towels, one of the wash cloths." When shown the forensic biology analysis report, the Petitioner stated that he had not seen it until post-conviction counsel showed it to him. The Petitioner said he would not have pleaded guilty if he had known the DNA evidence did not implicate him.

The Petitioner testified that he and trial counsel discussed the Petitioner's statements but that they "didn't go into that much detail about it." The Petitioner said that counsel advised him that his statements were damaging to the defense and that they discussed a motion to suppress but not in detail. The Petitioner claimed counsel said he was going to file a suppression motion.

Regarding the day of his arrest, August 9, 2017, the Petitioner testified that he fled at a high speed from the police when he saw blue lights and that the police "made [him] wreck." He said he told a woman who was in the car to run because the car was stolen. The Petitioner said Officer Mitchell ran to the car with his gun drawn, told the Petitioner to get out of the car, and dragged the Petitioner from the car. The Petitioner said he told the officers that he fled because he had found the car and knew it was stolen. The Petitioner said the officers did not advise him of his *Miranda* rights before asking why he fled. When asked if he was under the influence of drugs when he was arrested around 3:00 a.m., the Petitioner said, "Yeah," and explained he had smoked marijuana and used heroin at 10:30 p.m. when he finished work and again before he left his girlfriend's home after having taken a nap. The Petitioner said that he asked to be taken to a hospital for neck and knee pain but that the officers told him he was fine and did not take him for medical care. The Petitioner said he arrived at the police station around 5:00 a.m. He agreed that body camera footage previously received as an exhibit accurately depicted his being pulled from the wrecked car.

The Petitioner testified that he was placed in an interview room at the police station and that Sergeant Jones and Detective Brown introduced themselves and asked if he knew why he was there. The Petitioner said he replied that he was there "for high speeding the police in the stolen car and stuff like that." He said that the officers stated that the car had been involved in a robbery and that he denied any knowledge of a robbery. The Petitioner said that Sergeant Jones asked why the Petitioner had the robbery victim's debit card in his

pocket and that the Petitioner stated he found the debit card in the car. The Petitioner said he explained in detail where he found the car when he walked from his girlfriend's house to buy food. The Petitioner claimed the officers did not advise him of his *Miranda* rights before asking about the car. The Petitioner said the officers repeatedly accused him of lying, which he repeatedly denied. The Petitioner said one of the officers stated that the Petitioner's face would be shown on security footage from a camera at an ATM. The Petitioner said that after he remained quiet for a time, Detective Brown asked if he had children and stated that the Petitioner would not want someone else raising his children. The Petitioner said he continued to deny any involvement in a robbery. The Petitioner said that Sergeant Jones stated that the Petitioner was lying and that the officers were going to leave the room and give the Petitioner a chance to tell them what happened when they returned. The Petitioner said that he confessed to stealing the car and to committing one of the burglaries when the officers returned about ten minutes later. He said he confessed because he had been apprehended with the stolen car and debit card and because of the assertion that his face would be shown on the ATM surveillance footage. He said he confessed to an earlier burglary of the same victim's house. The Petitioner said he was not read his *Miranda* rights until after he gave these confessions. He identified the advice of rights form and his signature on it, and he agreed that it reflected he signed it at 6:03 a.m. He agreed that he had stated on the form that he was not under the influence of alcohol or drugs and said he did not want to "put [himself] in deep and more trouble . . . for being on some drugs." He said, however, that he was under the influence of drugs during the interview and that he felt like his "back was against the wall." He agreed that he had understood his rights when he signed the form. He said that when he was booked into the jail around 5:00 p.m. after he was charged, he had told a jailer he was not under the influence because he did not want to be placed "in detox."

The Petitioner testified that after he signed the advice of rights form, the officers prepared a typewritten statement about his confession to the two incidents and that they questioned him about another robbery. He said he gave a typewritten statement about this other robbery. The Petitioner agreed that he was given breakfast around 8:30 to 9:00 a.m. and that the officers continued questioning him and preparing typed statements "until around lunch time."

The Petitioner testified that he was given a "smoke break" around noon, that the officers did not offer to let him make a telephone call, and that he did not ask to make a call. He agreed that he was given lunch around 1:45 p.m. and that he had given approximately six confessions at this point. He said that after he ate lunch, he was asked about the incident involving the rape and that the officers only asked about the home invasion aspect of the case when they began questioning him about it. He agreed that he gave a typewritten confession. He said the officers then mentioned the rape, which he denied initially. The Petitioner said he admitted the rape after ten to fifteen minutes when Sergeant Jones told him that the truth would set him free, that a glove and towel containing

-10-

his semen and DNA had been recovered from the scene, and that the officers would help him when his case went to court for sentencing. He said he received the assurance that the officers would help him at sentencing after he asked if he would "get a lot of time." He later acknowledged that he had already confessed to the rape when he received the assurance that the officers would help him with sentencing. The Petitioner said that Detective Brown had been "nice" but that Sergeant Jones had been "aggressive" in questioning him.

The Petitioner acknowledged that he did not tell trial counsel "all these things" about the circumstances of his confessions when counsel represented him. The Petitioner said counsel "never asked" and that they "never got into full detail about it." The Petitioner said that counsel never asked him about whether he was questioned about the offenses before he was read his *Miranda* rights and that counsel only commented that the Petitioner had signed the advice of rights form and had made incriminating statements. The Petitioner acknowledged that he told counsel the officers had said they had evidence and would help the Petitioner and that he told counsel he had been under the influence of marijuana and heroin when he was interviewed. He said three to three and one-half hours elapsed from when he had last used marijuana and heroin until he talked to the police.

The Petitioner testified that trial counsel said he would try to suppress the identification one of the victims made from a photograph lineup. The Petitioner said counsel never mentioned trying to interview this victim.

The Petitioner testified that the first plea offer he received was for twenty years at 100% and that the second offer was for fifteen years at 100% followed by five years at 30%. The Petitioner said he accepted the second offer because he had "no fight" in view of his incriminatory statements. He said counsel was not pursuing suppression of the statements. The Petitioner said counsel advised him to plead guilty because of his incriminatory statements and because he faced a lengthy sentence if he were convicted at a trial. The Petitioner said this was the first case in which he had pleaded guilty. He acknowledged that he would have pleaded guilty if the trial court had denied a motion to suppress the statements. When the post-conviction judge, who had been the judge in the conviction proceedings, commented, "I would not have suppressed those statements," the Petitioner responded, "I figured that anyway."

The Petitioner testified that he was dissatisfied with trial counsel's efforts and that he did not think counsel had "put that much effort in." When asked why he had said at the guilty plea hearing that he was satisfied with counsel's performance, the Petitioner explained that he was asked this at the end of the hearing and that he "just w[e]nt along with it." He said, however, that he had not been satisfied with counsel's performance.

The Petitioner testified that if trial counsel had successfully suppressed his confessions, he would have gone to trial on the charges. The Petitioner said that counsel "did with what he could" but that counsel "didn't actually do what [the Petitioner] . . . asked him to do."

The Petitioner acknowledged his understanding that he would face "something like 144 years" if he were successful in his post-conviction case and were convicted at a trial. He agreed that he had understood trial counsel did not believe a legal basis existed for suppressing the confessions, but the Petitioner denied that counsel said this. The Petitioner claimed that counsel had stated he "was go[ing to] try to suppress them." The Petitioner then agreed that he had known counsel believed the statements would be admitted at the trial.

MPD officer body camera footage and security footage from an ATM were received as exhibits.

In a written order, the post-conviction court denied relief. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

**I**

**Ineffective Assistance of Counsel**

The Petitioner contends that the post-conviction court erred in denying relief on his ineffective assistance of counsel claims. To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

-12-

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

### A. Failure to File a Motion to Suppress the Petitioner's Statements

The Petitioner argues that the post-conviction erred in denying the claim that trial counsel was ineffective in failing to file a motion to suppress the Petitioner's inculpatory statements given on the day of the Petitioner's arrest, both at the scene and at the police station. The State responds that the court properly denied relief.

In its order denying relief on this basis, the post-conviction court found that the State made a reasonable offer that a person in the Petitioner's position might want to accept and that trial counsel had not wanted to create friction in the settlement process by filing a motion to suppress, given that the offer the defense had received was more favorable than that which counsel thought could be obtained "through litigation." The court found, as well, that the Petitioner stated he understood counsel's belief to be that no viable legal basis existed for suppression of the statements. The court found that counsel had not provided deficient performance in not filing a motion to suppress. The court noted, as well, that the Petitioner had the burden to show that had counsel filed the motion, it would have been granted. Although the court did not address this aspect further in its written order, it stated at the hearing that, based upon the evidence presented at the post-conviction hearing, it would not have granted the motion to suppress, had it been filed in the trial court.

The Petitioner asserts that trial counsel performed deficiently in not filing a motion to suppress because a "good argument" existed that the statements were not voluntarily

given, based upon the Petitioner's having told trial counsel that the Petitioner had been intoxicated at the time of the statements, the Petitioner's report to counsel about statements the police made indicating their willingness to help the Petitioner, an officer's statement to the Petitioner that "the truth will set you free," and the interaction between the Petitioner and the police at the scene of the arrest. The Petitioner notes trial counsel's testimony that suppression of the statements would have weakened the State's case.

The Petitioner also argues that he was prejudiced by counsel's deficient performance because the evidence does not show that he gave the statements voluntarily. He argues that pursuant to *State v. Smith*, 834 S.W.2d 915, 919 (Tenn. 1992), an initial confession given without *Miranda* warnings gives rise to a rebuttable presumption that a second confession, given after *Miranda* warnings, is tainted.

In support of his argument relative to the initial statement at the scene that he had fled the police because he was in a stolen car, the Petitioner notes his own testimony about having been arrested at gunpoint and asked why he fled from the police without first being advised of his *Miranda* rights. He notes his testimony that he was injured and under the influence of marijuana and drugs. In support of his argument relative to the statements given at the police station, the Petitioner notes his testimony that he was intoxicated from marijuana and heroin use, that the police made coercive and false statements to him and accused him of lying, and that he was questioned and made inculpatory statements about the crimes on two dates before he was advised of his *Miranda* rights. He also argues that he was age twenty at the time, was not given the opportunity to make a telephone call, and was not immediately taken to a magistrate.

The Petitioner's testimony about the facts and circumstances relative to his statements was at odds, in many material respects, with the testimony of Sergeant Jones and Detective Brown, the officers who interviewed the Petitioner at the police station. The Petitioner's argument that he would have prevailed in a motion to suppress, had trial counsel filed one, relies heavily on the Petitioner's account of the events attending the statements. At a suppression hearing, the trial court would have been called upon to make credibility determinations relative to the conflicting testimony. The post-conviction court's statement at the hearing that it would not have granted a motion to suppress carries an implicit finding that, upon hearing the evidence at the post-conviction hearing which would have been relevant at a suppression hearing, the court credited the officers' testimony over that of the Petitioner relative to the circumstances of the interview and the statements. The Petitioner's argument also overlooks the evidence of his guilt, independent of the confessions, which included his possession of a recently stolen car, his possession of a recently stolen debit card, and the discovery of stolen items at his home. *See Phillips v. State*, --- S.W.3d ---, 2022 WL 2092796, at *13-14 (Tenn. June 10, 2022) (holding that a post-conviction petitioner alleging ineffective assistance of counsel based upon a failure

to file a motion to suppress evidence must establish that the result of the case would have been different if the trial court had suppressed the evidence).

The Petitioner was charged with numerous felonies and faced a potential sentence in excess of 100 years. Trial counsel testified that he was optimistic about the prospect of obtaining a favorable settlement from the prosecutor and that the Petitioner was interested in a plea agreement. Based upon his knowledge of the facts and the law, counsel did not believe a motion to suppress would be granted. He explained this to the Petitioner. In counsel's view, filing a suppression motion might antagonize the prosecutor, who had already made a favorable settlement offer which counsel viewed as more advantageous to the Petitioner than what could be obtained by filing a motion to suppress, which counsel knew might affect the terms of a plea offer going forward. In addition, the State had significant other inculpatory evidence in addition to the Petitioner's statements. In consultation with the Petitioner, counsel made a tactical decision to pursue a settlement offer, rather than litigating the suppression issues. The post-conviction court agreed with counsel's assessment of the unlikelihood of success on a suppression motion.

The evidence does not preponderate against the post-conviction court's findings. Those findings support the court's conclusions that the Petitioner failed to establish by clear and convincing evidence that trial counsel performed deficiently in declining to file a suppression motion in preference to pursuing a favorable settlement of the case. The court's finding that the motion was without merit likewise supports its conclusion that the Petitioner was not prejudiced by counsel's alleged deficient performance. The Petitioner is not entitled to relief on this basis.

## B. Failure to Review Police Body Camera Footage

The Petitioner argues that the post-conviction court erred in denying his claim that trial counsel was ineffective because counsel did not review the police body camera footage. The Petitioner posits that if counsel had reviewed the body camera footage, a reasonable probability exists that counsel would have filed a motion to suppress after having seen "the patrol officers [yank] the Petitioner out of the car at gunpoint and then [question] him without advising him of the *Miranda* rights." The Petitioner again argues that such a motion would have been successful. The State responds that the court did not err in denying relief because suppression of the Petitioner's statement at the scene of the arrest would not have had any effect on the outcome of the conviction proceedings.

In denying relief on this basis, the post-conviction court stated:

Petitioner has not shown by clear and convincing evidence that trial counsel's performance was the below the objective standard of reasonableness by failing to look at the body cam footage in this case.

-15-

Trial Counsel stated that it was in the Petitioner's best interest to take the plea, and not to file and litigate a motion to suppress. Trial counsel stated that they were getting a better offer in this case than they could through litigation. Therefore, Petitioner has not proven that had trial counsel reviewed the body cam footage his decision regarding whether to file the motion to suppress would have been different. Therefore, Petitioner has failed to prove that by a reasonable probability that but for trial counsel's performance, the case would have resulted in a different outcome.

(Citations to the record omitted.)

Trial counsel testified about his difficulties with using email requests for obtaining discovery in this case. His not having reviewed the body camera footage is insignificant, however, for two reasons. First, no dispute existed about the facts of the arrest and the Petitioner's statement at the scene regarding his having found the car and the lack of *Miranda* warnings given at the scene. Counsel testified at the hearing that he had asked the Petitioner whether and at what point the police advised the Petitioner of his rights. The Petitioner has not identified anything counsel would have learned from watching the footage of which counsel was otherwise unaware. More significantly, however, counsel believed that the better strategy was not to pursue suppression in favor of settling the case in view of the favorable offer the prosecutor had made. As we discussed in section I.A. above, the record supports the post-conviction court's determination that counsel's election to pursue this strategy was not ineffective assistance. The Petitioner is not entitled to relief on this basis.

### C. Advising the Petitioner that his DNA was Identified

The Petitioner argues that trial counsel provided ineffective assistance by erroneously advising the Petitioner that his DNA was recovered from the scene of the rape incident. The Petitioner acknowledges that counsel testified he advised the Petitioner that the DNA analysis yielded inconclusive results, but he argues that his testimony that counsel told him the DNA was identified as his was more credible. The State responds that the post-conviction court credited counsel's testimony over that of the Petitioner and that this court should not disturb the post-conviction court's findings.

As the State correctly notes, the post-conviction court credited trial counsel's testimony that he advised the Petitioner of the inconclusive DNA results. Because we are bound by a post-conviction court's factual findings unless the evidence preponderates against them, it is not the function of this court to reweigh and reevaluate the evidence. *See*

*Henley*, 960 S.W.2d at 578; *see also Fields*, 40 S.W.3d at 456-57 (Tenn. 2001). The evidence in this case does not preponderate against the court's findings. The Petitioner is not entitled to relief on this basis.

## II

### Knowing, Voluntary, and Intelligent Guilty Pleas

The Petitioner contends that the post-conviction court erred in denying relief on his claim that he did not knowingly, voluntarily, and intelligently enter his guilty pleas. The State responds that the record supports the court's determination.

The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The Petitioner argues that his guilty pleas were not knowingly, voluntarily and intelligently entered because he pleaded guilty "without knowing whether he had a winning suppression issue," because counsel erroneously advised him that his DNA was found at the scene of the rape incident, and because he felt like he had no other option due to trial counsel's "placing minimal effort into the case."

In denying relief on this claim, the post-conviction court found

> Trial counsel testified that he never told the Petitioner to take the deal that was given, rather he explained to the Petitioner how serious the charges were and this was as low as the offer could possibly go, and that it was his decision whether he wanted to take the offer or not. Trial counsel has stated he did not believe it was a good idea to file the motion to suppress, and that he advised the Petitioner that the DNA evidence had come back inconclusive. Petitioner further stated in his testimony that nobody had forced or pressured

him into taking the guilty plea.  There also was no evidence of coercion in this case as to coercing the Petitioner to take the guilty plea.  Therefore, this Court finds that Petitioner's guilty plea was entered voluntarily, knowingly, and intelligently.

(Citations to the record omitted.)

The record reflects that at the guilty plea hearing, the Petitioner stated under oath that he was satisfied with his trial counsel, that he understood his rights, that he wanted to waive his right to a trial and plead guilty, that he had not been coerced or promised anything, and that he understood the terms of the plea agreement.  Trial counsel testified at the post-conviction hearing that he recommended for the Petitioner to accept the plea offer but that he would have pursued a suppression motion and a trial if the Petitioner preferred the latter.  Counsel said he advised the Petitioner about his sentencing exposure if he were convicted at a trial.  Counsel said he also advised the Petitioner about the strategy of pursuing the plea offer rather than litigation due to the likelihood that the trial court would deny a suppression motion.  Counsel said he further advised the Petitioner about the damaging effect the Petitioner's inculpatory statements were likely to have at a trial.  Counsel said he believed that, at the time, the Petitioner's desire was to accept the plea offer.

The post-conviction court credited the evidence that the Petitioner understood his alternatives and the likelihood of conviction and a lengthy sentence.  The court noted the absence of evidence that the Petitioner was coerced to accept the plea offer.  As we have stated previously, the court discredited the Petitioner's testimony that trial counsel gave him erroneous advice about the DNA analysis results.  The evidence does not preponderate against the court's factual determinations, which, in turn, support its conclusion that the Petitioner knowingly, voluntarily, and intelligently pleaded guilty.  The Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-18-